United States District Court

For the Northern District of California

1

2

3

4

5              UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA

7

8    RANDY PANKEY,                          No. C-06-03737 JCS

9              Plaintiff,                   **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'**
10        v.                                **MOTION FOR SUMMARY JUDGMENT,
                                            OR, IN THE ALTERNATIVE,**
11   CITY OF CONCORD, ET AL.,               **SUMMARY ADJUDICATION
                                            [Docket No. 107]**
12            Defendants.
     _____/

13

14   **I.    INTRODUCTION**

15        This is Plaintiff Randy Pankey's ("Pankey") second action against the City of Concord.

16   Plaintiff's first lawsuit ("the First Action") stemmed from his arrest by Concord Police Officers in

17   January 2003.  The instant action arises from Pankey's April 27, 2005 arrest for being under the

18   influence of a controlled substance and public intoxication.  On the basis of this arrest, Plaintiff sued

19   the City of Concord and nine individual Concord Police Officers allegedly involved in the arrest.

20   Plaintiff contends that his April 2005 arrest was unlawful and that the officers' conduct in

21   effectuating the arrest violated his rights under both state and federal law.  Subsequent to filing his

22   Complaint, Plaintiff had another encounter with the Concord Police that resulted in a further arrest.

23   In particular, on February 9, 2007, Plaintiff was arrested and charged with resisting a public officer,

24   making threatening phone calls and threatening crime with an intent to terrorize.

25        Defendants filed a Motion for Summary Judgment or, in the Alternative, Summary

26   Adjudication ("the Motion") on May 10, 2007.  The Court held a hearing on Defendants' Motion on

27   Friday, July 27, 2007, at 9:30 a.m.  For the reasons stated below,  Defendants' Motion is GRANTED

28   in part and DENIED in part.

United States District Court
For the Northern District of California

## II.     BACKGROUND

### A.     Facts[1]

#### 1.     The January 2003 Incident Which Gave Rise to Plaintiff's First Action

Plaintiff's First Action stemmed from an incident that occurred on January 26, 2003, when officers from the Concord Police Department ("CPD") responded to a call that a fight was in progress at a Concord residence. *See* USDC 04-2321 JCS.  In that action, Plaintiff alleged a personal injury claim pursuant to state law and Fourth Amendment violations under 42 U.S.C. § 1983 against the City of Concord.  In October 2005, the Court dismissed the case, granting the City of Concord's Motion for Summary Judgement, Or, In The Alternative, Summary Adjudication. *See* USDC 04-2321 JCS Order Granting Def.'s Mot. for Summ. J. or, in the Alternative, Summ. Adjudication.  The facts surrounding that incident are recounted in the Court's Order granting summary judgment. *Id.*

#### 2.     Facts Surrounding Plaintiff's April 2005 Arrest

Prior to the dismissal of his first action against the City of Concord, on April 27, 2005, Plaintiff had another encounter with the CPD that resulted in his arrest.  That evening, Pankey was at his neighbor Andrew Badger's house, drinking beer and playing darts in the garage.  Pl.'s Decl. and Opp'n to Def.'s Mot. for Summ. J., Exhibit N (June 21, 2005 Decl. of Andrew Badger ("Badger Decl. June 2005")) at 1.  Close to midnight, CPD officers entered Badger's garage and arrested Pankey for being under the influence of a controlled substance and public intoxication.  May 8, 2007 Decl. of Mark Coon in Supp. of Mot. for Summ. J. ("Coon Decl. May 2007"), Ex. C (November 9, 2006 Decl. of Todd Nunn Re: Pl.'s Mot. for Collateral Estoppel and Demand for Damages ("Nunn Decl. Nov. 2006"), Ex. A (Nunn Offense Report) at 2).  Pankey was subsequently transported to the CPD jail, where, without his consent, a forced blood sample was drawn to test for the presence of controlled substances. *Id.*  The facts surrounding the officers' entry of Badger's residence and the basis of Pankey's subsequent arrest are disputed by the parties.

---

[1]  The Court relies on facts that it finds to be undisputed and, where the facts are in dispute, draws all inferences in favor of the party opposing summary judgment.

2

United States District Court

For the Northern District of California

According to Defendants, on the evening in question, Concord Police Officer Todd Nunn was on routine patrol in a marked CPD patrol car near 3531 Thunderbird Drive. *Id.* at 1. As he drove westbound on Thunderbird Drive, Officer Nunn allegedly noticed that the garage door at 3531 Thunderbird was open and loud music was emanating from inside. *Id.* A male, later identified as Pankey, allegedly walked out of the garage and onto the driveway and yelled, "hey" several times in the officer's direction. *Id.* Officer Nunn allegedly made a u-turn to "see why Pankey was yelling and to ask him to turn down the music." *Id.*

The CPD dispatch log indicates that at 11:49 p.m. Officer Nunn notified police dispatch of his location at 3531 Thunderbird Drive, noting that there was a "male yelling." May 7, 2007 Decl. of Joseph Surges in Supp. of Mot. for Summ. J. ("Surges Decl."), Ex. A (Dispatch Log). In response to Officer Nunn's dispatch, Officers Scott Johnson, Dan Golinveaux, Alan Mughannam, Michael Huth, Michael Finney, and James Nakayama proceeded to 3531 Thunderbird to provide assistance. *See id.* "When an officer is assigned to a nighttime call or incident, at least one additional officer will provide backup, in order to ensure officer safety, and to provide assistance if necessary. If multiple officers are in the area and are not otherwise involved in another call, they too may provide backup . . ." Coon Decl. May 2007, Ex. C (November 14, 2006 Decl. of Dan Golinveaux Re: Pl.'s Mot. for Collateral Estoppel ("Golinveaux Decl. Nov. 2006")) ¶ 3.

Officer Nunn states that as he approached the open garage, he heard Pankey yell, "Here he comes," just as the garage door started to close and then open again. Nunn Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 1-2. As Officer Nunn entered the garage, Badger allegedly walked over to the stereo and turned down the volume. *Id.* at 2. Officer Nunn then allegedly told Badger and Pankey that the music was too loud and asked Pankey why he had been yelling. *Id.* According to Officer Nunn, Pankey responded that he was yelling because he was suing the City of Concord. *Id.*

In his Offense Report, Officer Nunn describes Pankey's demeanor, stating in relevant part:

> I noticed that his eyes were abnormally dilated, considering the lighting conditions at the scene. His speech was rapid, making him difficult to understand. He was sweating profusely considering the cold weather. He also had a white foamy substance around his mouth. Based on my training and experience, I found these physical symptoms to be consistent with those exhibited by someone under the influence of a controlled substance, specifically a central nervous

1  system (CNS) stimulant.  Pankey also had bloodshot watery eyes and
   had an odor of an alcoholic beverage about him.  Pankey was acting
2  very agitated walking around and yelling.

3  *Id.*  The dispatch log reflects that at 11:51 p.m., Officer Nunn radioed dispatch again, relaying in

4  reference to Pankey, that "one is combative."  Surges Decl., Ex. A (Dispatch Log).

5        Officer Nunn then allegedly asked Pankey and Badger to provide identification.  Nunn Decl.

6  Nov. 2006, Ex. A (Nunn Offense Report) at 2.  While Badger complied, Pankey allegedly continued

7  to yell, stating that he had done nothing wrong.  *Id.*  Because of Pankey's confrontational behavior

8  and the absence of a cover unit, Officer Nunn asked Badger and Pankey to sit down on some

9  furniture in the garage.  *Id.*  Pankey allegedly refused to sit down, even after Officer Nunn ordered

10 him to comply.  *Id.*  Officer Nunn's Offense Report states that Pankey then began to walk towards

11 Nunn in an aggressive manner with his fists clenched.  *Id.*  In response, Officer Nunn withdrew his

12 ASP collapsible baton and again ordered Pankey to sit down.  *Id.*  Pankey allegedly backed up but

13 did not sit down.  *Id.*  The Offense Report relates that as Officer Nunn's cover unit, Officer Scott

14 Johnson, arrived, Pankey finally sat down on the ground.  *Id.*  The dispatch log indicates that Officer

15 Johnson arrived at Badger's residence at 11:50 p.m.  Surges Decl., Ex. A (Dispatch Log); *see also*

16 Coon Decl. May 2007, Ex. C (November 15, 2006 Decl. of Scott Johnson Re: Pl.'s Mot. for

17 Collateral Estoppel ("Johnson Decl. Nov. 2006")) at ¶ 2.  In his Declaration, Officer Johnson

18 confirms that Officer Nunn's report is consistent with his recollection of the events giving rise to

19 Plaintiff's arrest.  Johnson Decl. Nov. 2006 at ¶ 4.

20       With Officer Johnson present, Officer Nunn allegedly again asked Pankey for his

21 identification.  Nunn Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 2.  According to Officer

22 Nunn, Pankey refused again and began to stand up.  *Id.*  Officer Nunn allegedly told Pankey to stay

23 seated several times.  *Id.*  Officer Nunn's Offense Report relates that "[Pankey] continued to try to

24 stand up so I grabbed his left wrist and Officer Johnson and I guided him to the ground face first.  I

25 placed his left wrist in a prone control hold and placed him in handcuffs for my safety. . . ."  *Id.*

26 Nunn's report states the basis of Pankey's arrest, relating, "[d]ue to his bizarre behavior and the

27 objective symptoms . . . I believed he was intoxicated and under the influence of a controlled

28

4

1    substance." *Id.* Officer Nunn told Pankey he was being arrested for being under the influence of a

2    controlled substance and public intoxication. *Id.*

3            Officer Golinveaux arrived at Badger's residence "about one minute" after Officer Nunn's

4    11:51 p.m. dispatch and just after Officer Johnson's arrival. Golinveaux Decl. Nov. 2006, Ex. A

5    (Gonlinveaux Offense Report) at 1. Officer Golinveaux's Offense Report provides the following

6    description of the scene in Badger's garage:

> As I approached the garage, I could hear one of the men, Randy
> Pankey, cursing. Officer Nunn ordered Pankey to sit in a chair. . . .
> Nunn asked Pankey for his name, but he refused to tell Officer Nunn
> his name. Officer Nunn placed Pankey under arrest. Pankey remained
> very belligerent and he continued cursing. Officer Nunn used a
> control hold to force Pankey to the ground to place him in handcuffs.
> Pankey was taken to a patrol car.

11   Golinveaux Decl. Nov. 2006, Ex. A at 1. Officer Golinveaux, however, played no part in arresting

12   or restraining Pankey. Golinveaux Decl. Nov. 2006 at ¶ 5.

13           Officers Alan Mughannam, Michael Huth, Michael Finney, and James Nakayama also

14   responded to Officer Nunn's initial dispatch, arriving on scene at 11:51 p.m, 11:52 p.m., 11:53 p.m.,

15   and 11:59 p.m., respectively. Surges Decl., Ex. A (Dispatch Log). Officer Mughannam, however,

16   recalls "that by the time I arrived at 3531 Thunderbird, Mr. Pankey was already in handcuffs, and

17   was either just about to be placed in a police vehicle or actually in a police vehicle. I never spoke to

18   Mr. Pankey, nor did I have any physical contact with him whatsoever." Coon Decl. May 2007, Ex.

19   C (November 15, 2006 Decl. of Alan Mughannam Re: Pl.'s Mot. for Collateral Estoppel

20   ("Mughannam Decl. Nov. 2006")) at ¶ 4. Officer Huth's Declaration similarly provides that "[b]y

21   the time I arrived, Mr. Pankey apparently had already been arrested, and presumably was in one of

22   the Concord Police Department vehicles at the scene." Coon Decl. May 2007, Ex. C (November 17,

23   2006 Decl. of Michael Huth Re: Pl.'s Mot. for Collateral Estoppel ("Huth Decl. Nov. 2006")) at ¶ 2.

24   When Officer Nakayama arrived on scene at 11:59 p.m., Pankey was in a patrol car. Coon Decl.

25   May 2007, Ex. C (November 14, 2006 Decl. of James Nakayama Re: Pls. Mot. for Collateral

26   Estoppel ("Nakayama Decl. Nov. 2006")) at ¶ 4. Neither Officer Golinveaux, Mughannam, nor

27   Huth played any role in restraining Pankey or subsequently transporting him to the CPD jail. *See*

28   Nov. 2006 Decls. of Golinveaux, Mughannam and Huth.

United States District Court

For the Northern District of California

After placing Pankey under arrest, Officer Nunn transported Pankey in his patrol car to the CPD jail.  Nunn Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 2.  In route to the jail, Pankey allegedly continued to yell and accused Officer Nunn of "beating" him.  *Id.*  Pankey also allegedly stated, "You are some stupid motherfuckers, I planned all this so I could sue your asses" and "My lawyer was a Supreme Court Justice and he is gonna get you fired."  *Id.*

At the CPD jail, Officer Nunn checked Pankey's pupils, noting that they were approximately 7.0 mm and did not react to direct light from a flashlight.  *Id.*  According to Officer Nunn, because Pankey was combative, Nunn was unable to obtain a pulse or ask him to perform a standing Rhomberg Test.  *Id.*  Pankey also refused to provide a blood sample, which according to the officers, was required as evidence for the crime for which he was being arrested.  Finney Decl. Nov. 2006 at ¶ 3.  Pankey stated, "I ain't giving you shit" and "[y]ou aren't taking my blood," and "[i]f you try to take my blood I'll fuck you up and sue you."  Nunn Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 3.  Pankey was placed in a WRAP restraint device so that a blood sample could be drawn.  Finney Decl. Nov. 2006 at ¶ 3; Nunn Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 3.  David Brown, a registered nurse and employee of the Contra Costa County Blood Alcohol Determinants, performed the blood test.  Surges Decl., Ex. B (Brown Decl.).  A subsequent toxicology report revealed the presence of both methamphetamine (.21 mcg/ml) and amphetamine (.03 mcg/ml) in Pankey's system.  Surges Decl., Ex. C (Report of Toxicology Examination).  The forensic toxicologist who analyzed Pankey's blood sample testified in a deposition that the level of methamphetamine in Pankey's blood was ten times greater than the level at which a negative result would be reported.  Coon Decl. May 2007, Ex. E (January 10, 2007 Dep. of Monica Siegrist ("Siegrist Dep.")) at 58.  While still restrained in a WRAP device, Pankey was transported to the Contra Costa County/Martinez Detention Facility.  Finney Decl. Nov. 2006 at ¶ 4.

A criminal history check conducted at the CPD jail revealed that Pankey was on probation for violating Health and Safety Code Section 11550 which prohibits the unauthorized possession or

6

1   use of controlled substances.[2]  Nunn Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 3.  The terms

2   of his probation included "shall not commit offense, obey all laws and consume no alcohol."  *Id.*

3   Pankey was ultimately charged and prosecuted for violating Health and Welfare Code Section

4   11550.  Mot. at 5.  The District Attorney's Office, however, dismissed the criminal charges after

5   Superior Court Judge Leslie Landau suppressed evidence concerning Officer Nunn's observations

6   leading to Pankey's arrest.  *Id.*  Judge Landau found that the CPD's warrentless entry of Badger's

7   residence preceding Pankey's arrest violated Pankey's Fourth Amendment rights.  *Id.*

8           Plaintiff's account of the events leading to his arrest materially differs from the version

9   depicted in the Officers' Offense Reports.  Pankey contends that CPD officers entered Badger's

10  garage "without legal reason, and without probable cause."  Pl.'s Mot. for Collateral Estoppel at 2.

11  Pankey further claims that the CPD officers, without provocation, attacked him by slamming his

12  face into the floor.  *Id.*  Pankey asserts that after he was arrested and transported to the CPD jail, he

13  was again "attacked by a number of Concord Police Department Officers whom administered a

14  medical procedure against [his] will, while physically brutalizing . . . and hurting . . . [him] badly."

15  *Id.* at 2-3.  Pankey also claims that later, while being transported to the Martinez jail, Officer Nunn

16  pulled over at the Thunderbird Auto Mart and physically and verbally abused him, causing Pankey

17  to urinate in the WRAP device within which he was being restrained.  *Id.*

18          In his declaration, Andrew Badger provided an eye-witness account of the events that

19  allegedly transpired in his garage, relating:

20              On April 27, 2005, I was at home unwinding after a hectic
                week of work with my neighbor, Randy Pankey, with a couple beers
21              and some darts.  I walked in the house to use the restroom and returned
                to the garage immediately, approximately one to two minutes later,
22              and was quite shocked at the several officers in my garage with hands
                drawn high (wielding side arms) approaching my neighbor in the back
23              corner of my garage near my dartboard.  I quickly drew my hands high
                with palms forward in a non-aggressive manner and stated, "don't

24

25  ───────────────
        [2]  Specifically, California Health and Welfare Code § 11550 provides, in relevant part, "[n]o
26  person shall use, or be under the  influence of any controlled substance [including amphetamine and
    methamphetamine] . . . except when administered by or under the direction of a person licensed by the
27  state to dispense, prescribe, or administer controlled substances. . . .  Any person convicted of violating
    this subdivision is guilty of a misdemeanor and shall be sentenced to serve a term of not less than 90
28  days or more than one year in a county jail.  CAL. HEALTH & SAFETY CODE § 11550(a) (West 2002).

shoot" frantically as I felt in danger of the aggressive nature of the officers.

I was told to sit down and shut up, which I did, still being quite surprised at the now many officers in my garage. I estimated about eight officers at that time in my garage after entering to several officers approaching Mr. Pankey and several more following up the driveway rapidly. . . . [T]wo officers rushed Mr. Pankey and forced him aggressively to the ground while a third officer pulled out his expandable baton. Once Mr. Pankey was forced to the ground and handcuffed, the officers quickly drug [sic] him to a patrol car and drove away. . . . [T]he officers were referring to Mr. Pankey as "Randy" from the time I walked into my garage. It seemed as if the Concord Police had entered my home already prepared to find and detain "Randy" Pankey.

After the officers left my home. . . . I called the Concord Police Department still trying to figure out what prompted an officer, *especially this many*, to rush into my garage. I was told that there were no officers on Thunderbird Drive, very definitely not 3531 Thunderbird Drive. . . . I waited until morning and called again. At that time . . . I was again told there were no officers at my home the previous evening. . . . I proceeded to the police station to talk to someone. . . . Once again, I was told that there was no record of any officers at my home. . . . After continuing to tell the desk clerk that there were officers in my home, she finally found something on her screen stating a noise complaint. . . .

Late that night about 10 p.m. or so, Officer Nunn called me back and stated he was the supervising officer and was at my home the night before. He stated that he could not tell me why Mr. Pankey was taken, that is only something that Mr. Pankey can release, and then continued to tell me he was taken on suspicion of being under the influence of a controlled substance. . . . Officer Nunn continued to tell me that no side arms were pulled or out of their holster at any time. I was again given the reason of a noise complaint as to why the officers even showed up at my home, which I continued to ask how that could warrant so many officers showing up at the same time. . . . I was told that Mr. Pankey flagged down an officer on routine patrol through the neighborhood, and became boisterous (which was the noise complaint). After this transpired, Mr. Pankey then invited the officer into my garage were [sic] he became louder and aggressive. The rest of the officers only showed up at a noise complaint because they were out looking for the first officer since he had not checked in for some time. . . .

This is all to have transpired while I was in the restroom with the window open to the street for one to two minutes, and with all the supposed loud noise and commotion that I did not hear. . . . Furthermore, Mr. Pankey was attempting to finish a round of darts when I returned to the garage and witnessed the officers approaching Mr. Pankey in my garage, not following him in from the street as stated by Officer Nunn. . . .

I was especially surprised and shocked after reading the "official" incident report from the Concord Police Department regarding this situation. . . . The report states that the officer, after being hailed, was walking up my driveway and the garage door started to close and then opened back up. Mr. Pankey was on the opposite

United States District Court

For the Northern District of California

1   wall from the garage door opener controls and I was still in the
2   restroom.  The report also states that once in my garage, I walked over
    and turned down the stereo and Mr. Pankey, myself, and the officer
3   talked for a minute and that is when the officer felt nervous regarding
    Mr. Pankey's alleged aggression since his back up cover unit had not
4   arrived and the report states that Mr. Pankey allegedly approached the
    officer with clenched fists in an aggressive manner.  As I said, I
5   walked into my garage with Mr. Pankey in the back corner of my
    garage near my dart board with several officers approaching him in an
6   aggressive manner; all the while Mr. Pankey was asking what they
    (the officers) were doing in my garage. . . .  The report continues to
7   state that Mr. Pankey had been directed to sit down several times and
    had not complied while yelling he had done nothing wrong, and was
8   guided to the ground face first in a prone control hold while continuing
    to try and stand up. . . .  The fact is Mr. Pankey never sat down.
9   Therefore, he could not be continuing to try and stand up as the report
    states.  Mr. Pankey was taken from an upright standing position to a
10  hold with his hands behind his back and his face thrown to the
    concrete floor before the rest of his body.  There were also many
11  officers in my garage at this time; I would estimate about eight
    officers. . . .

12  Pl.'s Decl. and Opp'n to Mot. for Summ. J., Ex. N (Badger Decl. June 2005) at 1-6.

13          Pankey also submitted an "updated" declaration from Badger providing his account of the

14  events following Pankey's arrest.  *See* Pl.'s Decl. and Opp'n to Mot. for Summ. J., Ex. N (January

15  18, 2007 Decl. of Andrew Badger ("Badger Decl. Jan. 2007")).  In pertinent part, Badger states:

16          Mr. Pankey called from West County Detention Facility asking
    us to call the bail bondsmen to ask if we could get him released.  At
17  this time, he had also informed us that in the transfer from the CPD to
    the county jail in Martinez, the officer transporting him stopped at the
18  Thunderbird Auto Mart and physically assaulted him.
            Mr. Pankey's mother proceeded to call the bails [sic]
19  bondsmen to see what we could do. . . .  After getting the run around
    from different chains of command at the CPD, she finally had a
20  member of the CPD that could answer the question that Mr. Pankey
    was arrested the night before; however that officer stated that he was
21  arrested at Thunderbird Auto Mart on Salvio Drive and not at my
    house on Thunderbird Drive.

22

23  *Id.*  A declaration submitted by Rosalie Pankey corroborates Badger's statements, relating, "when I

24  contacted the Concord Police Department to inquire about my son Randy Pankeys [sic] arrest . . .

25  they informed me that Randy was not arrested at 3531 Thunderbird Drive but was arrested at

26  Thunderbird Auto Mart. . . ."  Pl.'s Decl. and Opp'n to Mot. for Summ. J., Ex. Q (September 19,

27  2006 Decl. of Rosalie Pankey ("Rosalie Decl. Sept. 2006")).

28

**B.      Procedural History**

**1.      The First Action**

Pankey's First Action in this Court was initiated on January 26, 2004 and named only the City of Concord as a defendant. *See* USDC 04-2321 JCS.  In that action, Pankey asserted claims under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations by the CPD; namely, the use of excessive force and an unreasonable search and seizure in the warrantless and non-consensual taking and testing of his blood without probable cause. *See id.*  Pankey also asserted a state law personal injury claim. *Id.*  Defendant moved for, and the Court granted, summary judgment on both the state tort and section 1983 claims.  USDC 04-2321 JCS Order Granting Def.'s Mot. for Summ. J. or, in the Alternative, Summ. Adjudication.  The Court dismissed the tort claim because Pankey failed to file a timely claim as required under the California Tort Claims Act. *Id.*  With respect to Plaintiff's section 1983 claims, the Court found that Pankey had failed to present any evidence suggesting that the actions of the CPD officers were taken pursuant to an unconstitutional policy or custom as required to establish municipal liability under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978). *Id.*  The Court dismissed Plaintiff's First Action on October 17, 2005. *Id.*

**2.      The Instant Action**

While Plaintiff's First Action was still pending, on April 25, 2006, Pankey filed a form Complaint in Contra Costa Superior Court initiating the instant action against the City of Concord and nine individual Concord Police Officers.[3]  *See* Compl., Attach. 1.  The Complaint itself does not allege any specific causes of action.  An attachment to the Complaint, however, provides the following statement from Pankey:

> I was subjected again to an unprovoked attack from the Concord Police Department for no reason whatsoever.  There wasn't any reason whatsoever to attack me except for the retaliation from the suit I had filed previously against the Concord Police Department.

---

[3]  Attachment 1 to Plaintiff's Complaint listed the following Concord Police Officers: "Nunn, Johnson, Golinvevx, Rice, Maghannan, Huth, Finny, Nakayama, Zalee."  A number of the Officers' names were misspelled.  As there is no Concord Police Officer with the name "Rice," at Plaintiff's request, the Court dismissed "Rice" from the action. *See* Docket No. 74.  Officers Nunn, Johnson, Golinveaux, Mughannam, Huth, Finney, Nakayama, and Zalec remain in the action as Defendants.

United States District Court
For the Northern District of California

Compl., Attach. 5.  The attachment also lists the following fifteen theories of liability:

1)  False Arrest;

2)  Excessive Force;

3)  Undergo a Medical Treatment Against My Will;

4)  False Imprisonment;

5)  Malicious Prosecution;

6)  Negligence;

7)  Violating My Civil Liberties;

8)  Retaliation Against Me for Appending [Sic] a Federal Civil Suit;

9)  Police Brutality;

10)  Criminal Negligence;

11)  Emotional Distress;

12)  Harassment;

13)  Unlawful Use of Power;

14)  Not Acting Within the Legal Limits of the Law;

15)  Disregard for Public Safety.

Compl., Attach. 5.  Construing Pankey's Complaint as asserting claims under 42 U.S.C. § 1983, Defendants removed the action to the United States District Court for the Northern District of California.  *See* Docket No. 1.

On November 3, 2006, Plaintiff filed a Motion for Collateral Estoppel and Demand for Damages ("Collateral Estoppel Motion"), which sought a ruling giving collateral estoppel effect to Superior Court Judge Landau's suppression ruling in the state criminal suit against Pankey.  *See* Docket No. 41 (Collateral Estoppel Motion).  Plaintiff's Collateral Estoppel Motion also set forth a demand of $55 million for the Defendants' alleged constitutional violations.  *Id.*  On November 28, 2006, the Court denied Plaintiff's Collateral Estoppel Motion.  *See* Docket No. 69.

### 3.    Defendants' Summary Judgment Motion

Defendants filed the current Motion for Summary Judgment, or, in the Alternative, Summary Adjudication on May 10, 2007.  The City Defendant seeks summary judgment on Plaintiff's section

United States District Court

For the Northern District of California

1   1983 claims and on all state law claims with the exception of the claims for false arrest and false

2   imprisonment.  With respect to the section 1983 claims, Defendants assert that there is no evidence

3   of a policy or practice that satisfies the requirements for imposition of municipal liability under

4   *Monell*.  Defendants assert that they are also entitled to summary judgment on all of Plaintiff's state

5   law claims against the City – with the exception of the claims for false arrest and false imprisonment

6   – because under California Government Code Section 815, public entities are immune from liability

7   for common law torts.[4]

8       The Officer Defendants seek summary judgment on Plaintiff's section 1983 claims to the

9   extent they are based on the nonconsensual blood test and alleged retaliation.  Defendants argue that

10  the blood draw was lawful and did not violate Plaintiff's Fourth Amendment rights.  As for the

11  retaliation claim, Defendants assert that summary judgment is appropriate because the CPD Officers

12  involved in Pankey's April arrest were unaware of his pending lawsuit.

13      The Officer Defendants are also seeking summary judgment on Plaintiff's state law claims of

14  "emotional distress" and malicious prosecution.  Defendants argue that they are entitled to summary

15  judgment on Plaintiff's claim of "emotional distress" because Plaintiff conceded in deposition

16  testimony that he had not received professional treatment for his "mental anguish."  Defendants also

17  assert that Plaintiff's claim of false arrest precludes his claim of malicious prosecution, entitling the

18  Officer Defendants to summary judgment.

19      With respect to Plaintiff's remaining claims of "police brutality," "criminal negligence,"

20  "harassment," "unlawful use of power," "not acting within the legal limits of the law," and

21  "disregard for public safety," Defendants argue they are not cognizable private causes of action

22  under California law and therefore should be dismissed.  Defendants also request that Officers Huth,

23

24

25      [4]  In California, "false arrest and false imprisonment are not separate torts.  False arrest is but
26  one way of committing a false imprisonment, and they are distinguishable only in terminology." *Collins
    v. City and County of San Francisco*, 50 Cal. App. 3d 671, 673 (1975).  As a result, Plaintiff's claims
27  of false arrest and false imprisonment are one and the same.  Pursuant to California Government Code
    Sections 820.4 and 815.2(a), the City may be held liable if the Officer Defendants are found to have
28  falsely arrested or imprisoned Plaintiff.

United States District Court

For the Northern District of California

1   Mughannam, and Golinveaux be dismissed from the action because they did not meaningfully

2   participate in Plaintiff's arrest.

3        Defendants have not moved for summary judgment on Plaintiff's section 1983 claims of

4   false arrest and excessive force against the Officer Defendants nor Plaintiff's state law claims of

5   false arrest, false imprisonment and negligence against the Officer Defendants.

6        Plaintiff filed an Opposition to Defendant's Motion on May 25, 2007, in the form of a

7   declaration, providing a number of supporting exhibits and declarations relating to his January 2003

8   and April 2005 arrests.[5]  *See* Docket No. 110.  Plaintiff's Opposition, however, only addresses

9   Defendant's legal arguments regarding the City of Concord's liability.  In essence, Plaintiff argues

10   that his declarations demonstrate a policy or practice of police misconduct on the part of the CPD.

11        Plaintiff also submitted declarations and exhibits relating to a February 2007 arrest that

12   occurred after Plaintiff initiated this action.  Pankey contends that his February 2007 arrest was also

13   unlawful and that he was again "brutally attacked" by CPD officers.  Pl.'s Decl. and Opp'n to Mot.

14   for Summ. J. at 3.  To support his allegations, Pankey submitted declarations from Rosalie Pankey,

15   Charles Bomar, Andrew Badger, Erica Badger, and Elizabeth Meyer.  *See* Pl.'s Decl. and Opp'n to

16   Mot. for Summ. J., Exs. S-W.

17        Pankey's mother, Rosalie Pankey, provided a declaration that relates that on February 9,

18   2007, the Concord Police came to her house looking for her son.  Pl.'s Decl. and Opp'n to Mot. for

19   Summ. J., Ex. S (February 9, 2007 Decl. of Rosalie Pankey ("Rosalie Decl. Feb. 2007")).  Ms.

20   Pankey told the police that Pankey was not home, but moments later he appeared, walking up the

21   driveway.  *Id.*  Ms. Pankey described the subsequent encounter as follows:

22          The police grabbed my son, threw him against the garage door and
            then the officer hit Randy in his face saying "don't resist."  Randy
23          said, "I am not resisting," which he wasn't because I saw it all.  Then
            he threw my son on top of the hood of the car in the driveway and hit
24          him several times saying it again and again, "Stop resisting". . . .  He
            threw my son to the gro[und] after hitting him several times and put
25          his knee into his neck and was hurting his arm.  Randy was in
            handcuffs he did that right away then hit my son more.  That's why I
26          couldn't understand why he was hitting my son. . . .

27        ────────────────

28        [5]  Because Pankey's Opposition is also a signed and sworn declaration, his assertions constitute evidence.

13

*Id.*

Another eye-witness, Charles Bomar, stated in a declaration, "I . . . personally witnessed Mr. Randy Pankey being struck in the face unprovoked by a Concord Police Officer. . . .  Mr. Pankey put up no resistance and continued to shout "I'm not resisting."  Pl.'s Decl. and Opp'n to Mot. for Summ. J., Ex. T (February 9, 2007 Declaration of Charles Bomar ("Bomar Decl. Feb. 2007")). Elizabeth Meyer's declaration similarly relates:

> [T]wo officers turned towards Randy, rushed him and one of the officers just punched him in the face, slammed him face down onto the hood of my 300zx which is parked in the driveway and kept punching him.  No questions were asked by the officers prior to just rushing towards him.  One of the two officers just started punching Randy in the face, then slammed Randy on the hood of my car.  Randy was not confrontational nor a threat in any way. . . .

Pl.'s Decl. and Opp'n to Mot. for Summ. J., Ex. W (March 22, 2007 Declaration of Elizabeth Meyer ("Meyer Decl. Feb. 2007")).

Defendants filed a Reply Brief in response to Plaintiff's Declaration and Opposition, providing declarations and offense reports from the officers involved in Pankey's February 2007 arrest.  Defendants also provided a Federal Rule 26(a)(2) expert report compiled by Joseph Callanan, a police practices expert retained by Defendants, addressing both the April 2005 and February 2007 arrests.  Defendants' declarations provide some context for the Concord Police Officers' arrival at Pankey's residence on February 9, 2007.  The Defendants do not dispute that the officers used force during the most recent arrest.  However, whether or not Pankey resisted arrest is disputed.

According to Defendants, at around 5 p.m. on February 9th, Community Service Officer ("CSO") Susette Regis requested Officer Brian Tanner's assistance on a telephone call.  May 31, 2007 Declaration of Brian Tanner Re: Reply in Supp. of Defs. Mot. for Summ. J. ("Tanner Decl."), Ex. A (Tanner Offense Report) at 1.  Officer Tanner listened in on the line and heard a male voice, later identified as Pankey, screaming about receiving threatening telephone calls.  *Id.*  After Pankey allegedly screamed belligerently for a few more minutes, CSO Regis transferred the call to Officer Tanner.  *Id.*  After Officer Tanner identified himself, Pankey demanded that Tanner listen to the threatening calls he had received from an ex-girlfriend.  *Id.*  Officer Tanner agreed to listen to the recorded "threats."  *Id.*  Upon listening to the six recordings, Officer Tanner concluded that the calls

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1  had not been threatening but instead were rather polite. *Id.* Pankey's ex-girlfriend apparently

2  wanted her passport returned. *Id.* Upon hearing Officer Tanner's opinion, Pankey again erupted

3  angrily, screaming unintelligibly. *Id.* Officer Tanner told Pankey that if he did not lower his voice,

4  Tanner would end the call. *Id.* Pankey continued screaming and yelling that he would sue Officer

5  Tanner and the police department and demanded Tanner's name and badge. *Id.* Officer Tanner

6  complied with Pankey's request and Pankey then hung up. *Id.*

7       Officer Tanner subsequently pulled up Pankey's history with the Concord Police Department

8  and noted a previous 5150 incident as well as several other incidents.[6] *Id.* Pankey subsequently

9  called the police department again, requesting to talk with Officer Tanner. *Id.* When Tanner picked

10  up the phone, Pankey immediately began screaming that he was a victim of threatening telephone

11  calls and wanted to speak to the watch commander. *Id.* When Officer Tanner again explained that

12  he did not find the phone calls threatening, Pankey began screaming "something to the effect of

13  kicking someone's ass and asking [Tanner] to come over to his residence." *Id.* Pankey continued to

14  scream in a belligerent manner. *Id.* Officer Tanner told Pankey that he needed to stop calling the

15  Police if he was "not going to speak civilly." *Id.* Pankey began screaming loudly again and hung up

16  the phone. *Id.*

17       A few minutes later, CSO King received another phone call from Pankey. *Id.* After several

18  more calls from Pankey, Officer Tanner overheard King request that Pankey stop making threats.

19  *Id.* According to Officer Tanner, "[d]ue to Pankey's continued harassment and demeanor . . .

20  coupled with his comments made to me and his previous contacts with the Concord Police

21  Department, I created a call to be sent to patrol requesting officers attempt to contact Pankey at his

22  residence and conduct a welfare check to determine whether or not he was a danger to himself or

23  others." *Id.* Officer Tanner noted in his call Pankey's dislike of the Concord Police Department. *Id.*

24  In the event that Pankey was deemed not to be a danger to himself or others, Tanner requested that

25  the officers tell Pankey to stop calling the CPD in an annoying or harassing manner. *Id.* at 3.

26

27       [6] California Welfare and Institutions Code § 5150 provides, "[w]hen any person, as a result of
    a mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer
28  . . . may, upon probable cause, take . . . the person into custody . . . for 72-hour treatment and
    evaluation." CAL. WELF. & INST. § 5150 (2002).

**United States District Court**
For the Northern District of California

1    Officers Jeff Krieger and Joshua Graham responded to Officer Tanner's dispatch, arriving at

2    Pankey's residence around 5:40 p.m. May 29, 2007 Decl. of Jeff Krieger Re: Def.'s Mot. for Summ.

3    J. ("Krieger Decl."), Ex. A (Krieger Offense Report); May 31, 2007 Decl. of Joshua Graham Re:

4    Def.'s Mot. for Summ. J. ("Graham Decl."), Ex. A (Graham Offense Report). As related by Officer

5    Krieger's Offense Report, Pankey's mother, Rose, answered the door and told the Officers that

6    Pankey had left the house twenty minutes earlier. Krieger Decl., Ex. A (Krieger Offense Report) at

7    1. Rose refused Officer Krieger's request to go inside the house. *Id.*

8    According to Krieger's report, Elizabeth Meyer, Pankey's girlfriend, suddenly appeared on

9    the street in front of the residence. *Id.* at 2. Officer Krieger noted that Meyer showed signs of

10   intoxication with red watery eyes and an odor of alcohol. *Id.* When Officer Krieger escorted Meyer

11   back to the residence, where she said she lived, Rose came out and forbid her from entering. *Id.* As

12   Meyer walked back onto the porch, a male, later identified as Pankey, yelled from behind the

13   officers, "I'm here!! Let her back in the house Rose." Graham Decl., Ex. A (Graham Offense

14   Report) at 2. Both Officers turned around and Pankey ran back around the corner of the house

15   towards the garage, dropping a full bottle of beer. Krieger Decl., Ex. A (Krieger Offense Report) at

16   2. The Officers yelled "stop," but Pankey refused to comply. Graham Decl., Ex. A at 2. Officer

17   Graham's Offense Report relates, "I had every intention to detain Pankey and knew he was now

18   resisting my efforts. . . ." *Id.*

19   As the Officers followed Pankey around the corner, they saw that he was trying to open the

20   garage door. Krieger Decl., Ex. A at 2. Pankey was wearing a large flannel shirt that made it

21   difficult to see his belt line or his pockets. *Id.* Officer Krieger related further that, "[b]ased on my

22   training and experience, I know people often keep their weapons and tools in their garage. Not

23   knowing what Pankey keeps in his garage, I was fearful that Pankey was trying to get inside and

24   once there, he could arm himself with any number of items located inside." *Id.*

25   Officer Graham's Offense Report relates the following course of events:

26       I pushed the garage door down and wrapped my arms around
         Pankey's upper arms and body. I pushed him against the garage door
27       and told him to stop. Pankey looked at me with a very angry face. I
         was behind him, but slightly to his left side at this time. I said to
28       Pankey, "Don't fight me." Pankey turned himself to his left so that he

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was facing me. He did this while I was still trying to hold him against the garage door and gain control of him. This was the first instance I realized that Pankey was stronger than me. Pankey had a muscular build. He is 6'0" tall and I am 5'9" tall. The height difference and his strength made it difficult for me to gain the leverage necessary to adequately control Pankey. I could also detect a strong odor of an alcoholic beverage coming from his breath. From my training and experience, I knew that intoxicated people are often difficult to control, due to their irrational and often violent behavior, and their reduced ability to feel pain. . . .

Pankey turned toward me and said, "Get the fuck off me!" He had an enraged look in his eyes and his face turned red. His body tensed up and he brought up his arms up in front of him with clenched fists. . . . It was obvious to me he was preparing to fight me.

Corporal Krieger then grabbed Pankey's right arm. . . . I released my hold of Pankey when Corporal Krieger grabbed Pankey's arm. I then grabbed Pankey [sic] left arm and attempted to bend it behind his back to obtain a rear wrist lock control hold. His arm was tense and again, I realized that he was stronger than me and I was not able to apply this control hold. I then attempted to place the arm in a twist lock control hold. Again, I was not able to obtain the hold due to Pankey's strength and continual resistance.

Corporal Krieger began to push Pankey toward a vehicle that was parked in the driveway. I also saw him place his left leg in front of Pankey's right leg and attempt a leg sweep take-down. . . . Corporal Krieger was not able to accomplish the take down.

It was at this time that I heard both Meyer and Rose screaming at us. . . . I saw them both coming toward our location. . . . I became afraid that they were going to attack us. Our backs were facing them and much of the equipment on our belts was exposed. . . . I felt that either Rosalie or Meyer were going to intervene. . . .

I then placed my right leg in front of Pankey's left leg and tried to force him forward and take him down to the ground. . . . I felt that Pankey could be best controlled on the ground. . . . I knew that if we did not get him into custody quickly, Corporal Krieger and I could be defending ourselves against three people. . . .

I attempted my take-down but was not able to achieve it. Again, Pankey was too strong and I could not overcome his resistance. . . . Although I was equipped with a Taser, OC spray, and a baton, it was not feasible for me to use any of these items at this point. . . .

At this time, I decided to strike Pankey in an attempt to stun and distract him long enough to gain control of his arm. . . . I wanted to gain control of his arm as quickly as possibly for my safety, and the safety of Corporal Krieger. I delivered a punch with my right fist to the left cheek area of Pankey's face, while still maintaining a grasp of Pankey's left arm with my left hand. The punch struck him on the cheekbone area just beneath his left eye. The punch was effective . . . . Pankey's body and arms loosened and we were able to force him down over the hood of a vehicle in the driveway. . . . Corporal Krieger was able to pull Pankey's right arm behind his back and I was able to then handcuff both of the hands. . . .

Meyer continued to walk all around us while we were struggling with Pankey. . . . Corporal Krieger advised me he was going to handcuff Meyer. He went to place handcuffs on Meyer while

17

I held Pankey against the hood of the vehicle he was on. Pankey began yelling at Meyer to run from Corporal Krieger. He said, "You are fast! Run right now! Run away! Run from them now!" He arched his body up and attempted to stand up. I forced him back down onto the vehicle and told him not to get up. He continued to push against me. I felt that it would be best to control him on the ground where he could not easily stand up. I pulled him off of the car and guided him down to the ground. I controlled his decent [sic] while holding onto his right arm. . . . Pankey rolled onto his back and continued to try and sit up. I placed my left knee onto his chest and told him to stay down. I was putting weight on his chest to hold him there. . . . He then began to spit. . . . I placed my left knee across the left side of his face, forcing his face to point to the right of his body, where he could not spit on me. He continued to yell and resist against my efforts to control him. Rosalie was also screaming at me the entire time and I felt she was going to try and intervene. . . . Corporal Krieger requested another unit to respond to our location "Code Three;" an emergency response. . . .

Officer J. Sousa then arrived and placed Pankey's legs into a figure four leg-lock. After this, Pankey seemed to calm down. Numerous other units arrived as well, including Sgt. Garmon. He was notified of the use of force. Pankey was able to stand and did not appear to have any serious injuries. He began to yell again and said that he was suing the Concord Police Department. He told me he was going to have me fired and said to, "Kiss your badge goodbye!"

Graham Decl., Ex. A (Graham Offense Report) at 3-5. Officer Graham then transported Pankey to

the CPD jail. *Id.* at 5. According to Officer Krieger, at the CPD jail, Pankey yelled and was abusive

towards CSI Duncan, who was there to photograph Pankey's injuries. *Id.* Officer Krieger then

attempted to interview Pankey about the incident but Pankey refused to comply. Krieger Decl., Ex.

A (Krieger Offense Report) at 3. Pankey then requested medical attention for what he described as

"a broken hand, sore back and facial pain." *Id.* Officer Krieger called an AMR paramedic unit. *Id.*

Upon the ambulance's arrival, however, Pankey refused treatment. *Id.* at 4. Pankey was

18

United States District Court

For the Northern District of California

1  subsequently released and charged with violating Penal Code Sections 148(a)[7], 653m(a)[8] and 422.[9]

2  Def.'s Reply Brief In Supp. of Mot. for Summ. J. at 5.

3       In their Reply, Defendants argue that even assuming Plaintiff's version of the February 2007

4  incident is true, the number of incidents relied upon by Plaintiff is, as a matter of law, too limited to

5  constitute a "custom or practice" under *Monell*.  Moreover, Defendants argue that Plaintiff may not

6  rely solely on his own experiences to establish liability under *Monell*.  In addition, they assert that

7  Plaintiff has conceded his claims of excessive force, medical treatment against . . . [his] will,

8  malicious prosecution, retaliation, police brutality, criminal negligence, emotional distress,

9  harassment, unlawful use of power, not acting within legal limits of law, and disregard for public

10  safety and they are thus subject to dismissal.

11

12  _____

13      [7]  California Penal Code § 148(a) provides:

14          Every person who willfully resists, delays or obstructs any public officer
. . . in the discharge or attempt to discharge any duty of his or her office

15          or employment, when no other punishment is prescribed, shall be
punished by a fine not exceeding one thousand dollars ($1,000) or by

16          imprisonment in a county jail not to exceed one year, or by both that fine
and imprisonment. CAL. PENAL CODE § 148(a) (West 2002).

17      [8]  California Penal Code § 653m(a) provides:

18          Every person who, with the intent to annoy, telephones or makes contact

19          by means of an electronic communication device with another and
addresses to or about the other person any obscene language or addresses

20          to the other person any threat to inflict injury to the person or property of
the person addressed or any member of his or her family, is guilty of a

21          misdemeanor.  CAL. PENAL CODE § 653m(a) (West 2002).

22      [9]  California Penal Code § 422 states:

23          Any person who willfully threatens to commit a crime which will result
in death or great bodily injury to another person, with the specific intent

24          that the statement, made verbally, in writing or by means of electronic
communication device, is to be taken as a threat, even if there is not

25          intent of actually carrying it out, which, on its face and under the
circumstances in which it is made, is so unequivocal, unconditional,

26          immediate, and specific as to convey to the person threatened, a gravity
of purpose and an immediate prospect of execution of the threat, and

27          thereby causes that person reasonably to be in sustained fear for his or
her own safety . . . shall be punished by imprisonment in the county jail

28          not to exceed one year, or by imprisonment in the state prison.  CAL.
PENAL CODE § 422 (West 2002).

1   Plaintiff filed a Response to Defendant's Reply, agreeing to dismiss Officers Huth,

2   Mughannam, and Golinveaux from the action.  Plaintiff, however, rejected Defendants' assertion

3   that he had conceded any of his claims.

4   **III.    ANALYSIS**

5   **A.  Legal Standard for Summary Judgment**

6   Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be

7   rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

8   together with affidavits, if any, show that there are no genuine issues as to any material fact and that

9   the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine"

10  issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for

11  the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

12  In order to prevail, a party moving for summary judgment must show the absence of a

13  genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or

14  to a defense on which the nonmoving party will bear the burden of persuasion at trial.  *Celotex Corp.*

15  *v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210

16  F.3d 1099 (9th Cir. 2000).  Once the movant has made this showing, the burden shifts to the party

17  opposing summary judgment to "designate specific facts showing there is a genuine issue for trial."

18  *Celotex*, 477 U.S. at 323.  To establish a "genuine" issue of fact when opposing summary judgment,

19  a plaintiff must "produce at least some significant probative evidence tending to support" the

20  allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

21  The Court need not "scour the record in search of a genuine issue of material fact."  *Keenan v. Allen*,

22  91 F.3d 1275, 1279 (9th Cir. 1996).  While the Court must construe a pro se litigant's pleadings

23  liberally, pro se parties must nonetheless meet the specificity requirement of Rule 56 to withstand a

24  grant of summary judgment.  *Posadas De Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir.

25  1988).

26  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

27  inferences from the facts are jury functions, not those of a judge. . . .  The evidence of the non-

28  movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477

**United States District Court**
For the Northern District of California

1   U.S. at 255.  Moreover, the Ninth Circuit has made clear that "police misconduct cases almost

2   always turn on a jury's credibility determinations" and district courts should grant summary

3   judgment "sparingly" in this context.  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

4       **B.      Dismissal of Officers Golinveaux, Huth and Mughannam**

5       In their Motion, Defendants argue that Officers Golinveaux, Huth and Mughannam should be

6   dismissed from the action because they did not meaningfully participate in Pankey's April arrest and

7   therefore cannot be held liable for any of Plaintiff's alleged injuries.  In his Response to Defendant's

8   Reply, Plaintiff agreed to dismiss the three officers.  Accordingly, the Court grants the Defendants

9   Motion as to these Defendants and dismisses Officers Golinveaux, Huth and Mughannam from this

10  suit.  Officers Nunn, Johnson, Finney, Nakayama and Zalec constitute the remaining "Officer

11  Defendants."

12      **C.      Plaintiff's Claims**

13      As a preliminary matter, the Court must liberally construe Plaintiff's Complaint and identify

14  the claims alleged.  Defendants have construed Plaintiff's Complaint as asserting federal claims

15  pursuant to 42 U.S.C. § 1983 as well as claims under state law.  According to Defendants, under

16  section 1983, Plaintiff alleges claims of excessive force, false arrest and an unreasonable search and

17  seizure in the nonconsensual and forced taking and testing of his blood.  It is unclear whether

18  Defendants construe Plaintiff's claim of retaliation as a state or federal claim.  Defendants interpret

19  Plaintiff's properly pled state law claims as those of false arrest, false imprisonment, intentional

20  infliction of emotional distress ("IIED"), negligence and malicious prosecution.

21      The Court, however, comes to a different conclusion on the claims asserted in the Complaint,

22  finding that Plaintiff's claims of excessive force, false arrest, an unreasonable search and seizure,

23  retaliation and malicious prosecution all fall within the scope of section 1983 and may be brought

24  pursuant to the federal statute.  In addition, the Court construes Plaintiff's Complaint as asserting a

25  substantive due process violation under section 1983.  The Court construes Plaintiff's state law

26  claims as those of false arrest, false imprisonment, intentional infliction of emotional distress,

27  negligence, malicious prosecution, and battery.

28

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    As noted above, it is unclear whether Defendants construe Plaintiff's claim of retaliation

2  under state or federal law.  A claim of retaliation, however, may be brought as a federal claim

3  pursuant to 42 U.S.C. § 1983.  *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir.

4  1988) (holding that retaliation against an individual's exercise of protected First Amendment rights

5  is actionable under section 1983).  The Court therefore construes Plaintiff's Complaint as alleging a

6  claim of retaliation under section 1983.

7    Defendants construe Plaintiff's claim of malicious prosecution as only a state law claim.

8  However, because a malicious prosecution claim may be brought pursuant to 42 U.S.C. § 1983, the

9  Court construes Plaintiff's Complaint as alleging claims of malicious prosecution under both state

10  and federal law.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561-62 (9th Cir. 1987).

11    Defendants assert that Plaintiff's claim of "unlawful use of power" is not cognizable under

12  federal or state law.  The Court, however, finds that Plaintiff's allegation of "unlawful use of power"

13  may be construed as alleging a substantive due process violation under section 1983.  *See County of*

14  *Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (holding that substantive due process protects

15  against arbitrary governmental action).  Accordingly, the Court interprets Plaintiff's Complaint as

16  alleging a substantive due process claim under section 1983.

17    Turning to Plaintiff's state law claims, the Court agrees that Plaintiff alleges claims of false

18  arrest, false imprisonment, negligence and IIED under state law, but construes Plaintiff's Complaint

19  as also alleging a battery claim based on Plaintiff's allegation of "police brutality."

20    In regards to Plaintiff's claim labeled simply "emotional distress," Defendants point out that

21  it's unclear whether Plaintiff is alleging a claim of intentional infliction of emotional distress or

22  negligent infliction of emotional distress.  In California, however, there is no tort of negligent

23  infliction of emotional distress.  *See Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 785 (1993).

24  Such an action is governed by the tort of negligence.  *See id.*  The Court therefore construes

25  Plaintiff's claim of "emotional distress" as asserting a claim of IIED.

26    Defendants assert that Plaintiff's allegations of criminal negligence, harassment, "unlawful

27  use of power," "not acting within the legal limits of the law" and "disregard for public safety" are

28  not cognizable private causes of action under California law.  The Court agrees.  Accordingly, the

22

1   Court dismisses Plaintiff's Tenth (criminal negligence), Twelfth (harassment), Fourteenth ("not

2   acting within the legal limits of the law"), and Fifteenth ("disregard for public safety") causes of

3   action.

4        In sum, the Court construes Plaintiff's Complaint as properly alleging federal law claims of

5   false arrest, excessive force, an unreasonable search and seizure, retaliation, malicious prosecution

6   and a substantive due process claim pursuant to 42 U.S.C. § 1983.  Under state law, Plaintiff alleges

7   claims of intentional infliction of emotional distress, negligence, malicious prosecution and battery.

8        **D.      Plaintiff's Claims Pursuant to Section 1983 Against the Officer Defendants**

9        As discussed above, the Court construes Plaintiff's Complaint as alleging the following

10  claims pursuant to Section 1983: false arrest, excessive force, an unreasonable search and seizure,

11  retaliation, malicious prosecution and a substantive due process violation.  Section 1983 provides

12  that,

13       Every person who, under the color of any statute . . . subjects . . . any
         citizen of the United States or other person within the jurisdiction
14       thereof to the deprivation of any rights, privileges, or immunities
         secured by the Constitution and law, shall be liable to the party injured
15       in an action at law, suit in equity, or other proper proceeding for
         redress.

16

17  42 U.S.C. § 1983**.**  "Section 1983 is not itself a source of substantive rights but merely provides a

18  method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271

19  (1994).  To state a claim pursuant to section 1983, a plaintiff must allege two essential elements: (1)

20  that a right secured by the Constitution and laws of the United States was violated; and (2) that the

21  alleged violation was committed by a person acting under the color of the law.  *West v. Atkins*, 487

22  U.S. 42, 48 (1988).  In addition, where a plaintiff asserts a section 1983 claim against a municipality

23  based on the actions of its employees, the plaintiff must establish that the acts complained of were

24  taken pursuant to a policy or practice of the municipality.  *See Monell,* 436 U.S. at 658.

25            **1.      Unreasonable Search and Seizure**

26       Under section 1983, Plaintiff seeks to recover damages from both the City of Concord and

27  the individual CPD officers on the grounds that the non-consensual drawing and testing of his blood

28  constituted an unreasonable search and seizure in violation of the Fourth Amendment.  Defendants

United States District Court

For the Northern District of California

1   assert that the officers did not violate Plaintiff's Fourth Amendment rights because law enforcement

2   officers may obtain a blood sample from a criminal suspect to preserve evidence of intoxication, so

3   long as the blood is drawn in a reasonable manner and in accordance with accepted medical

4   procedures.  Defendants, however, fail to acknowledge that the validity of a warrantless blood test

5   turns on the existence of probable cause.  *See Schmerber v. California*, 384 U.S. 757 (1966).  As

6   discussed below, the existence of probable cause for Pankey's arrest turns on a material disputed fact

7   and therefore, the Officer Defendants are not entitled to summary judgment on Plaintiff's claim of

8   an unreasonable search and seizure.

9        In *Schmerber v. California*, the Supreme Court found that blood tests constitute a "search

10   and seizure" under the Fourth Amendment.  *Schmerber*, 384 U.S. at  767.  The *Schmerber* Court

11   held that it did not violate the Fourth Amendment for the police, upon probable cause but absent a

12   warrant, to test a blood sample withdrawn from a hospitalized D.U.I. suspect who had declined to

13   take a breathalyser test and did not consent to a blood test.  *Id.* at 772.  *Schmerber,* however, requires

14   that a warrantless compulsory blood test be supported by both probable cause and exigent

15   circumstances.  *Ellis v. City of San Diego*, 176 F.3d 1183, 1191 (9th Cir. 1999); *see also United*

16   *States v. Chapel*, 55 F.3d 1416, 1419 (9th Cir. 1995) (holding that under the Fourth Amendment,

17   "before a law enforcement officer may lawfully take a blood sample without consent or a warrant, he

18   or she must have probable cause to believe that the suspect has committed an offense which the

19   current state of one's blood will constitute evidence.").  While force may be used to extract a blood

20   sample from a resistant suspect, *see Hammer v. Gross*, 932 F.2d 842, 845 (9th Cir. 1991), the search

21   may be unreasonable and in violation of the Fourth Amendment if excessive force is employed.  *See*

22   *Ellis*, 176 F.3d at 1191.

23        Probable cause is found when the facts and circumstances known to the arresting officer are

24   sufficient to warrant a prudent person to believe that the person arrested has committed or was

25   committing an offense.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also Barry v. Fowler*, 902 F.2d

26   770, 772 (9th Cir. 1990).  Here, there is a question of material fact with respect to the existence of

27   probable cause for Pankey's arrest.  The essence of Plaintiff's claim is that Concord Police officers

28   entered Badger's garage without probable cause or legal reason.  Although Defendants claim that

United States District Court

For the Northern District of California

1   Pankey summoned Officer Nunn into the garage and Pankey demonstrated symptoms of being under

2   the influence of a controlled substance (*see* Nunn Decl. Nov. 2006, Ex. A), Pankey and Badger's

3   declarations suggest that the CPD officers entered on their own accord and without probable cause.

4   *See* Pl.'s Decl. and Opp'n to Mot. for Summ. J, Ex. N (Badger Decl. June 2005).  Because material

5   issues of fact remain with respect to the existence of probable cause, Defendants are not entitled to

6   summary judgment on Plaintiff's Fourth Amendment claim of an unreasonable search and seizure in

7   the warrantless and nonconsensual drawing of Pankey's blood.  Accordingly, summary judgment is

8   denied with respect to Plaintiff's section 1983 claim of an unreasonable search and seizure against

9   the Officer Defendants.

10                  **2.      Retaliation**

11          Plaintiff contends that his alleged unlawful arrest and the alleged use of excessive force was

12   the product of retaliation by the Concord Police Department in response to the filing of his previous

13   lawsuit, which was pending at the time of his arrest.  Defendants assert that they are entitled to

14   summary judgment on Plaintiff's retaliation claim because Plaintiff failed to submit evidence

15   demonstrating the required causal link between his first lawsuit and any alleged misconduct by

16   Defendants.  The Court agrees only in part.  In particular, the Court finds that Plaintiff has

17   demonstrated a genuine issue of material fact with respect to his retaliation claim against Officer

18   Nunn but not as to the remaining Officer Defendants.

19          To state a claim of retaliation under section 1983, Plaintiff must establish two essential

20   elements: 1) that his conduct was protected by the Constitution; and 2) that the protected conduct

21   "was a substantial or motivating factor in any retaliatory acts taken by" the state actor Defendants.

22   *Berry v. Atkins*, No. C 93-20473, 1995 WL 691869, at *3 (N.D. Cal. Nov. 15, 1995).  In *Sorranno's*

23   *Gasco, Inc. v. Morgan*, the Ninth Circuit found that the First Amendment protects the right to access

24   the courts and petition the government for redress.  874 F.2d 1310, 1314 (9th Cir. 1989)  (citing

25   *California Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 510 (1972)).  The Court further

26   noted that the "[d]eliberate retaliation against an individual's exercise of this right is actionable

27   under section 1983."  *Id.*  Therefore, Plaintiff's initiation of legal proceedings against the Concord

28   Police Department constitutes constitutionally protected conduct.

**United States District Court**

For the Northern District of California

1    With respect to the second prong, in *Mt. Healthy City School District Board of Education v.*

2    *Doyle*, the Supreme Court held that a plaintiff alleging a claim of retaliation under section 1983 must

3    demonstrate that the protected activity was a "substantial" or "motivating factor" for defendant's

4    conduct.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Defendants

5    contend that none of the officers involved in Pankey's April arrest had any knowledge of his

6    pending lawsuit.  Defendants provided declarations from the eight officers involved in Pankey's

7    arrest in which they each state they had no knowledge of Pankey's pending lawsuit prior to his April

8    2005 arrest.  *See* Johnson Decl. Apr. 2007 ¶ 4; Finney Decl. Apr. 2007 ¶¶ 3-4; Nakayama Decl. May

9    2007 ¶¶ 3-4; Nunn Decl. Apr. 2007 ¶¶ 3-4; Zalec Decl. Apr. 2007 ¶¶ 3-4.  In his Opposition,

10   Plaintiff asserts that Officer Nunn was aware of the lawsuit because in Badger's garage, he told

11   Officer Nunn that he was suing the City of Concord.  Pl.'s Decl. and Opp'n to Mot. for Summ. J. at

12   12.  The parties do not dispute that prior to his arrest, Pankey told Officer Nunn of his pending

13   lawsuit against the City of Concord.  *See* Pl.'s Decl. and Opp'n to Mot. for Summ. J. at 12; Nunn

14   Decl. Nov. 2006, Ex. A (Nunn Offense Report) at 2.  As a result, Pankey has created a question of

15   fact as to whether his pending lawsuit against the City of Concord was a "substantial" or

16   "motivating" factor for the alleged misconduct of Officer Nunn.  Plaintiff, however, has failed to

17   present any evidence suggesting that his pending lawsuit was a "substantial" or "motivating" for the

18   alleged misconduct of the other Officer Defendants.  Accordingly, Officers Johnson, Finney

19   Nakayama and Zalec are entitled to summary judgment on Plaintiff's retaliation claim.  Summary

20   judgment is denied on Plaintiff's retaliation claim against Officer Nunn.

21                    **3.       Malicious Prosecution**

22   The Ninth Circuit has held that claims of malicious prosecution are not cognizable under

23   section 1983 if process is available within the state judicial system to provide a remedy.  *Usher v.*

24   *City of Los Angeles*, 828 F.2d 556, 561-62 (9th Cir. 1987).  "However, an exception exists to the

25   general rule when malicious prosecution is conducted with the intent to deprive a person of equal

26   protection of the laws or is otherwise intended to subject a person to a denial of constitutional

27   rights."  *Id.*  A plaintiff alleging malicious prosecution under section 1983 must therefore establish:

28   1) the elements of the state law tort; and 2) an intent to deprive the plaintiff of a constitutional right.

United States District Court

For the Northern District of California

1   *See Madrigal v. California*, No. CV F 06-0595 AWI SMS, 2006 WL 3834284, *3 (E.D. Cal. Dec.

2   26, 2006).  In California, to prevail on a claim of malicious prosecution, the Plaintiff must establish

3   that the prior action was: 1) "commenced by or at the direction of the defendant and pursued to a

4   legal termination in plaintiff's favor"; 2) "brought without probable cause"; and 3) "initiated with

5   malice."  *Sagonowksy v. More*, 75 Cal. Rptr. 2d 118, 128 (Cal. Ct. App. 1998).  "[W]here police

6   officers do not act maliciously or with reckless disregard for the rights of an arrested person, they are

7   not liable for damages suffered by the arrested person after a district attorney files charges unless the

8   presumption of independent judgment by the district attorney is rebutted."  *Blankenhorn v. City of*

9   *Orange*, 485 F.3d 463, 482 (9th Cir. 2007).  The presumption of prosecutorial independence may be

10  rebutted by showing that the investigating officers presented the prosecutor with information known

11  to be false.  *Id.*  "A police officer who maliciously or recklessly makes false reports to the prosecutor

12  may be held liable for damages. . . ." *Id.*

13        Here, it is undisputed that the prosecution was terminated in Plaintiff's favor.  Therefore, to

14  obtain summary judgment on this claim, Defendants must establish, *as a matter of law*, that

15  Plaintiff's prosecution was supported by probable cause or that it was initiated without malice.

16  Defendants have failed to meet this burden.

17        Construed liberally, Pankey's Complaint alleges that the police officers involved in his April

18  2005 arrest produced false reports which resulted in the filing of criminal charges and the initiation

19  of judicial proceedings against him.  *See* Pl.'s Decl. and Opp'n to Mot. for Summ. J. at 7.  Pankey

20  supports his claim of fabrication with conclusory allegations of falseness and Badger's declaration

21  disputing the veracity of Officer Nunn's Offense Report.  *See* Pl.'s Decl. and Opp'n to Mot. for

22  Summ. J. at 7, 11, 12, 15, Ex. N (Badger Decl. June 2005).  In *Sloman v. Tadlock*, the Ninth Circuit

23  found that conclusory allegations of fabrication of police reports, standing alone, are insufficient to

24  prevent summary judgment.  *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994).  In

25  *Blankenhorn*, however, the Ninth Circuit distinguished the facts of *Sloman*, noting that "[t]he key

26  fact in *Sloman* was that the plaintiff did not point to any evidence of fabrication other than the fact

27  that the officers' reports were inconsistent with his own account of the incidents leading to his

28  arrest."  *Blankenhorn*, 485 F.3d at 483.  In contrast, in *Blankenhorn*, the plaintiff provided a

**United States District Court**
For the Northern District of California

1   declaration from an eye-witness whose account contradicted the officer's report.  *Id.*  Accordingly,

2   the Ninth Circuit reversed the District Court's grant of summary judgment on a malicious

3   prosecution claim where the Plaintiff alleged that the police had included false information in their

4   police reports upon which the district attorney had relied.  *Id.*

5        Here, Pankey and Badger's version of Pankey's April 2005 arrest materially differs from the

6   accounts of the Concord Police Officers provided in their offense reports.  As in *Blankenhorn*,

7   Plaintiff has supported his claim of fabrication with a declaration from an eye-witness who disputes

8   the facts contained in the official police reports.  *See* Pl.'s Decl. and Opp'n to Mot. for Summ. J., Ex.

9   N (Badger Decl. June 2005).  As a result, there is a material dispute of fact on the question of

10  prosecutorial independence and hence, whether the prosecution was initiated with malice and/or

11  without probable cause.  The Court, therefore, cannot say as a matter of law that Pankey's claim of

12  malicious prosecution fails.  Accordingly, summary judgment is denied with respect to Plaintiff's

13  section 1983 malicious prosecution claim against the Officer Defendants.

14               **4.       Substantive Due Process**

15       As discussed above, the Court interprets Plaintiff's allegation of "unlawful use of power" as

16  a substantive due process claim.  The Fourteenth Amendment's substantive due process clause

17  protects against the arbitrary or oppressive exercise of governmental power.  *See County of*

18  *Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).  "[T]he Due Process Clause is violated by

19  executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a

20  constitutional sense."  *Id.* at 847 (quoting *Collins v. Harker Heights,* 503 U.S. 115, 128 (1992))

21  (internal quotation marks omitted).  The cognizable level of executive abuse of power is that which

22  "shocks the conscience" or "violates the decencies of civilized conduct."  *Id.* at 846.  Mere

23  negligence or liability grounded in tort does not meet the threshold requirement to establish a

24  substantive due process violation.  *Id.* at 849.

25       Plaintiff here has alleged that he was falsely arrested and subjected to excessive force and

26  non-consensual medical tests by CPD Officers.  Viewing the facts in the light most favorable to

27  Plaintiff, the Court cannot say as a matter of law that the Defendant Officers' alleged misconduct

28

United States District Court

For the Northern District of California

1    does not shock the conscience.  Accordingly, the Court denies summary judgment for the Officer

2    Defendants on Plaintiff's substantive due process claim.

3           **E.    Municipal Liability for Section 1983 Claims**

4           Plaintiff asserts his section 1983 claims against the City of Concord on the grounds that the

5    City, through its police department, maintains a custom or practice of filing false police reports,

6    making false arrests and employing excessive force.  Defendants contend that even if Plaintiff's

7    accounts of his three arrests are true, the City is entitled to summary judgment on Plaintiff's section

8    1983 claims because Plaintiff has not presented evidence sufficient to establish a material issue of

9    fact that the alleged violations of his rights by the individual officers were conducted pursuant to a

10   policy, custom or procedure, as required under *Monell*.  The Court agrees with Defendants that

11   Plaintiff's *Monell* claims against the City of Concord fail as a matter of law.

12          Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its

13   employees on a theory of respondeat superior.  *Monell*, 436 U.S. at 691.  "Instead, it is when

14   execution of a government's policy or custom, whether made by its lawmakers or by those whose

15   edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as

16   an entity is responsible under § 1983."  *Id.* at 694.  A plaintiff seeking to establish municipal liability

17   under section 1983 may do so in one of three ways: 1) the plaintiff may demonstrate that a municipal

18   employee committed the alleged constitutional violation "pursuant to a formal governmental policy

19   or longstanding practice or custom which constitutes the standard operating procedure of the local

20   governmental entity;" 2) the plaintiff may demonstrate that the individual who committed the

21   constitutional violation was an official with "final policy-making authority and that the challenged

22   action itself thus constituted an act of official government policy;" or 3) the plaintiff may

23   demonstrate that "an official with final policy-making authority ratified a subordinate's

24   unconstitutional decision or action and the basis for it."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.

25   1996).  Here, there is no evidence that the alleged violations were either committed by an individual

26   with final policy-making authority or ratified by such an individual.  *See* Livingtston Decl. at 2.  As

27   a result, to reach the City of Concord, Plaintiff must raise a genuine issue of fact with respect to the

28

United States District Court

For the Northern District of California

1  existence of a policy or custom of the use of excessive force, false arrest, or the filing of false police

2  reports by the Concord Police Department.

3      The City of Concord has a formal policy, set forth in General Order 35, regarding the use of

4  force. *See* May 1, 2007 Decl. of David Livingston In Supp. of Mot. for Summ. J. ("Livingston

5  Decl."), Ex. A ("General Order 35").  Defendants acknowledge that during each of Plaintiff's three

6  arrests CPD officers employed force in accordance with General Order 35.  General Order 35

7  provides that the "use of force shall be restricted to those circumstances authorized by law and

8  limited to the degree necessary to accomplish a lawful task."  *Id.*  The policies set forth in General

9  Order 35, are not however, sufficient to give rise to municipal liability because they do not establish

10 an *unconstitutional* policy.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) (holding

11 that "where the policy relied upon is not itself unconstitutional, considerable more proof than the

12 single incident will be necessary in every case to establish both the requisite fault on the part of the

13 municipality and the causal connection between the policy and the constitutional deprivation.").

14     Absent a formal government policy that is unconstitutional, Plaintiff must demonstrate the

15 existence of a "longstanding practice or custom" of either excessive force, false arrest or false police

16 reports.  *Trevino*, 99 F.3d at 918.  As the Ninth Circuit explained in *Trevino*,

17         The custom must be so persistent and widespread that it constitutes a
        permanent and well-settled city policy. . . .  Liability for improper

18         custom may not be predicated on isolated or sporadic incidents; it must
        be founded upon practices of sufficient duration, frequency and

19         consistency that the conduct has become a traditional method of
        carrying out policy.

20

21 *Id.*  In *Trevino*, the Ninth Circuit affirmed summary judgment in favor of the defendant municipality

22 where the plaintiff alleged that the city council had a custom of paying officers' punitive damages in

23 excessive force cases.  *Id.* at 916.  The court found that the evidence fell "far short" of establishing a

24 widespread custom, for the purposes of *Monell*, where the city council had paid officers' punitive

25 damages in eleven or twelve cases while the action was pending but in no cases up to the date on

26 which the excessive force was allegedly used.  *Id.*  Similarly, in *Meehan v. City of Los Angeles,* the

27 Ninth Circuit held that two incidents involving alleged unconstitutional harassment did not support

28 the existence of a custom sufficient to establish municipal liability under *Monell*.  *Meehan v. City of*

United States District Court

For the Northern District of California

1    *Los Angeles*, 825 F.2d 102, 106 (9th Cir. 1988).  In *Henderson v. City and County of San Francisco*,

2    plaintiffs, who were present and former inmates of the San Francisco county jail, alleged that

3    individual sheriff's deputy defendants violated their rights by using excessive force against plaintiffs

4    and were deliberately indifferent to plaintiffs' serious medical needs on six separate occasions

5    between December 2003 and December 2004.  *Henderson v. City and County of San Francisco*, No.

6    C-05-234 VW, 2006 WL 3507944, at *1 (N.D. Cal. Dec. 1, 2006).  The plaintiffs in *Henderson* also

7    sought to hold the City of San Francisco liable under *Monell*, supporting their claim of a "custom or

8    practice" with a letter referencing eighteen additional grievances submitted by jail inmates involving

9    similar alleged misconduct in addition to the six instances alleged in the complaint.  *Id.* at *7, *10.

10   The District Court, however, held that the plaintiffs failed to establish a triable issue of fact and the

11   defendant was entitled to summary judgment on plaintiff's *Monell* claim.  *Id.* at * 11.

12           To support his claim of a custom or practice, Plaintiff relies on declarations relating to his

13   three arrests and the confidential disciplinary records of two officers involved in his arrest.  The

14   reports reveal that an excessive force complaint was previously filed against two of the officers

15   involved in Pankey's April arrest.  Both officers were eventually exonerated of the charges.

16   However, as Defendants highlight, Pankey's three arrests constitute a small fraction of the arrests

17   made by the Concord Police Department.  The Concord Police Department made approximately

18   3,700 arrests in 2005.  Surges Decl. ¶ 5.  Beyond the two complaints of excessive force, which were

19   both resolved favorably for the officers, Plaintiff points to no evidence that the Concord Police

20   Department has violated the constitutional rights of other arrestees.  Plaintiff's three arrests over the

21   course of four years, even when viewed in a favorable light, are insufficient as a matter of law to

22   constitute a "persistent and widespread practice" of constitutional violations.  Accordingly,

23   Plaintiff's *Monell* claim against the City of Concord must fail.

24           **F.      State Law Claims**

25           As discussed above, in addition to his federal claims pursuant to section 1983, Plaintiff also

26   alleges state law claims of false imprisonment, false arrest, IIED, negligence, malicious prosecution,

27   and battery.  Plaintiff seeks to hold both the individual police officers and the City of Concord liable

28   for his state law claims.  The City Defendant is seeking summary judgment on all of Plaintiff's state

United States District Court

For the Northern District of California

1    law claims, except for those of false arrest, false imprisonment and battery.[10]  The Officer

2    Defendants are seeking summary judgment on all of Plaintiff's state law claims except false arrest,

3    false imprisonment, battery, and negligence.

### 1.      Intentional Infliction of Emotional Distress

5         Plaintiff's eleventh cause of action is labeled as a claim of "emotional distress."  As

6    discussed above, the Court construes Plaintiff's claim as one of intentional infliction of emotional

7    distress.  Defendants assert that they are entitled to summary judgment on Plaintiff's claim because

8    Plaintiff has not provided any evidence of emotional distress resulting from Defendant's alleged

9    conduct.  Defendants rely on Plaintiff's deposition testimony admitting that he has never seen a

10   counselor, psychologist or psychiatrist for his "mental anguish."  *See* Coon Decl. May 2007, Ex. C

11   (October 23, 2006 Dep. of Randy Pankey ("Pankey Dep.")) at 214.  Plaintiff has not provided any

12   evidence to support his claim of "emotional distress" other than his own assertions.

13        Under California law, to prevail on a claim of intentional infliction of emotional distress,

14   Plaintiff must establish: "1) extreme and outrageous conduct by the defendant with the intention of

15   causing, or reckless disregard of the probability of causing, emotional distress; 2) the plaintiff's

16   suffering severe or extreme emotional distress; and 3) actual and proximate causation of the

17   emotional distress by the defendant's outrageous conduct."  *Davidson v. City of Westminster*, 32 Cal.

18   3d 197, 209 (1982).  To be considered "outrageous," the Defendants' alleged conduct "must be so

19   extreme as to exceed all bounds of that usually tolerated in a civilized community."  *Id.*  A plaintiff

20   may recover damages for emotional distress resulting from "fright, nervousness, grief, anxiety,

21   worry, mortification, shock, humiliation, and indignity, in addition to physical pain."  *Thing v. La*

22   *Chusa*, 48 Cal. 3d 644, 648-49 (Cal. Ct. App. 1989).  The emotional distress, however, must be "of

23   such a substantial quantity or enduring quality that no reasonable person in a civilized society should

24   be expected to endure it."  *McColm v. San Francisco Hous. Auth.*, No. C-02-05810 PJH, 2007 WL

25

26

---

27        [10] As the Defendants do not seek summary judgment on Plaintiff's federal excessive force claim
     and failed to address Plaintiff's state law battery claim, the Court assumes that Defendants do not seek
28   summary judgment on Plaintiff's battery claim.

United States District Court
For the Northern District of California

1575883, at *10 (N.D. Cal. May 27, 2007) (citing *Butler-Rupp v. Lourdeaux,* 36 Cal. Rptr. 3d 685 (Cal. Ct. App. 2005).

Pankey's intentional infliction of emotional distress claim arises from his alleged false arrest or the alleged use of excessive force.  As discussed above, significant questions of fact remain regarding the circumstances of Pankey's arrest and the force that was used.  Therefore, just as the Court may not hold as a matter of law that there was no use of excessive force, neither can the court say as a matter of law that the Defendant's conduct was not "outrageous."  *See Blankenhorn*, 485 F.3d at 487 n.17.  Nor have Defendants cited any authority that they are entitled to summary judgment merely on the basis that Plaintiff has not sought out professional treatment.

The Court also is not persuaded that Defendants are entitled to summary judgment on this claim on the basis of the California Tort Claims Act, under which public employees, including police officers, enjoy certain tort immunities.  California Government Code § 820.2 states, "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  Cal. Gov't Code § 820.2 (West 1995).  However, "California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force."  *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264 (Cal. Ct. App. 1967).  Officers are similarly liable for claims of false arrest and false imprisonment.  *See* Cal. Gov't Code § 820.4 (West 1995).[11]  As a result, if the officers used excessive force or falsely arrested Plaintiff in committing the tort of IIED, then they are not immune from liability for Plaintiff's IIED claim.  *See Duffy v. San Francisco Police Dep't*, No. C-02-2250 VRW, 2005 WL 47856, at *3 (N.D. Cal. Feb. 25, 2005).  Because material disputes of fact remain as to these underlying claims, as discussed above, the Defendant Officers are not entitled to summary judgment on Plaintiff's IIED claim.

Similarly, the City is not entitled to summary judgment on Plaintiff's IIED claim on the basis of immunity because this question turns on the same disputed facts.  The California Tort Claims Act

---

[11] California Government Code § 820.4 holds that: "[a] public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  Cal. Gov't Code § 820.4 (West 1995).

United States District Court

For the Northern District of California

1    provides that "[a] public entity is liable for injury proximately caused by an act or omission of any

2    employee of the public entity within the scope of his employment if the act or omission would, apart

3    from this section, have given rise to a cause of action against that employee or his personal

4    representative." CAL. GOV'T CODE § 815.2(a) (West 1995).  Section 815.2 (b) further provides

5    "[e]xcept as otherwise provided by statute, a public entity is not held liable for an injury resulting

6    from an act or omission of an employee of the public entity where the employee is immune from

7    liability."  Section 815.2 establishes that public entities are liable for the torts of their employees so

8    long as the employee does not enjoy a statutory immunity.  The City's immunity therefore depends

9    upon the immunity of the police officers.  *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir.

10   2002).  As the Defendants must show that the Officers are immune as a matter of law from liability

11   for Plaintiff's IIED claim, the City, in turn, is also not entitled to summary judgment based on the

12   same immunity.  Accordingly, neither the City Defendant nor the Officer Defendants are entitled to

13   summary judgment on Plaintiff's IIED claim.

14                    **2.      Negligence**

15         Pankey's sixth cause of action is a claim of negligence.  Defendants seek summary judgment

16   on Plaintiff's negligence claim only for the City Defendant on the grounds that pursuant to

17   California Government Code § 815, the City of Concord is immune from liability for common law

18   torts.  The Court, however, disagrees and denies summary judgment on Plaintiff's claim of

19   negligence against the City Defendant.

20         As with Plaintiff's claim of IIED, to the extent that Plaintiff's negligence claim arises from

21   either his alleged false arrest or the alleged use of excessive force, the officers, and thus the City of

22   Concord, are not immune from liability.  *See Graves v. City of Stockton*, No. Civ. 040430 DFLKJM,

23   2006 WL 768831, at *4 (E.D. Cal. Mar. 27, 2006) (denying officer and city defendants' motion for

24   summary judgment on plaintiff's state law claims of negligence, intentional infliction of emotional

25   distress and battery when question of fact remained regarding whether the officers used excessive

26   force when they arrested plaintiff).  As a result, neither the City nor the Officer Defendants are

27   entitled to summary judgment on Plaintiff's negligence claim.

28

United States District Court

For the Northern District of California

### 3.   Malicious Prosecution

Defendants argue that they are entitled to summary judgment on Plaintiff's state law claim of malicious prosecution on the grounds that Plaintiff's assertion that he was falsely arrested precludes a claim of malicious prosecution. Defendants direct the court to language in *Collins v. City and County of San Francisco*, 50 Cal. App. 671, 676 (Cal. Ct. App. 1975), to argue that a defendant cannot be held liable for both false arrest and malicious prosecution under state law. While the Court disagrees that *Collins* precludes Plaintiff from asserting his state law claim of malicious prosecution, the Defendants are entitled to summary judgment on alternative grounds.

In *Collins*, Wayne Collins was arrested and charged with violating California Penal Code Section 416 (refusing to disperse upon a lawful command). *Collins*, 50 Cal. App. at 674. After the charges were filed against Collins, the arresting Officer "swore out" a more detailed complaint, including new charges of violating Penal Code Section 408 ("participating in an unlawful assembly"). *Id.* Based on the new complaint, a magistrate issued a warrant for plaintiff's arrest. Subsequent to the issuance of the warrant, Collins stood trial for violating Penal Code Section 416 and was found guilty and fully served his sentence. *Id.* at 675. However, subsequent to completing his sentence, Collins was arrested pursuant to the warrant and kept in custody over night. *Id.* The charges upon which the warrant rested were dismissed three days later. *Id.* Collins then sued the City of San Francisco for false arrest based on the conduct of the arresting officer. The court held that under California Government Code Section 821.6, the City could be held liable for the Officer's tortious false arrest but not for malicious prosecution. *Id.* The Superior Court noted that the Officer's conduct could constitute either false arrest or malicious prosecution but not both. *Id.* at 676. The Court ultimately held that Collins' arrest and imprisonment pursuant to the warrant constituted malicious prosecution and as a result, the City could not be held liable. *Id.* at 677. *Collins*, however, only holds that the same conduct may not give rise to both a claim of false arrest and malicious prosecution. Nothing in *Collins* precludes a plaintiff from bringing a claim of malicious prosecution and false arrest so long as the claims are based on different conduct.

Here, Plaintiff's false arrest claim arises from the alleged unlawful entry of the Concord Police into Badger's garage and Pankey's alleged arrest without probable cause. Plaintiff's

1  malicious prosecution claim, in contrast, arises from his allegations that the officers involved in his

2  arrest filed materially false police reports which gave rise to criminal charges and proceedings

3  against him.  Consequently, Plaintiff's allegation of false arrest does not, under *Collins*, bar his

4  claim of malicious prosecution, even if it is only construed as a state law claim.

5         Nonetheless, the Officer and City Defendants are entitled to summary judgment on Plaintiff's

6  state law claim of malicious prosecution pursuant to California Government Code § 821.6 which

7  expressly immunizes public employees, including police officers, from liability for state law claims

8  of malicious prosecution.[12]  *See Asgari v. City of Los Angeles*, 937 P.2d 273, 281 (Cal. 1997).  The

9  police officers, and thus the City, are therefore immune from liability for Plaintiff's state law claim

10 of malicious prosecution.  Accordingly, the Court grants summary judgment for all Defendants on

11 Plaintiff's state law claim of malicious prosecution.

12 **IV.     CONCLUSION**

13         For the reasons stated above, Defendants' Motion is GRANTED in part and DENIED in part.

14 Specifically, the Court:

15         1.     GRANTS Defendants' request to dismiss Officers Golinveaux, Huth, and

16                Mughannam from the action;

17         2.     GRANTS summary judgment for the City of Concord on all of Plaintiff's claims

18                pursuant to 42 U.S.C. § 1983;

19         3.     DENIES summary judgment on Plaintiff's section 1983 claims of an unreasonable

20                search and seizure, malicious prosecution and his substantive due process claim

21                against Officers Nunn, Johnson, Finney, Nakayama, and Zalec;

22         4.     DENIES summary judgment on Plaintiff's section 1983 retaliation claim against

23                Officer Nunn but GRANTS summary judgment for Officers Johnson, Finney,

24                Nakayama, and Zalec on the retaliation claim;

25

26

27

28         [12]  California Government Code § 821.6 states that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously or without probable cause."  CAL. GOV'T CODE § 821.6 (West 1995).

United States District Court
For the Northern District of California

5.      DENIES summary judgment for all Defendants on Plaintiff's state law claims of intentional infliction of emotional distress and negligence; and

6.      DISMISSES Plaintiff's claims of harassment, criminal negligence, not acting within the legal limits of the law, and disregard for public safety.

Consequently, the following claims remain for trial:

1.      Plaintiff's federal claims pursuant to 42 U.S.C. § 1983 of false arrest, excessive force, an unreasonable search and seizure, malicious prosecution, and a substantive due process claim against the Officer Defendants and a retaliation claim against Officer Defendant Nunn; and

2.      Plaintiff's state law claims of false arrest, false imprisonment, battery, IIED, and negligence against the Officer Defendants and City Defendant.

IT IS SO ORDERED.


Dated: August 2, 2007

_____
JOSEPH C. SPERO
United States Magistrate Judge